A-570-106, C-570-107
Scope Inquiry
Kaylang Phragmites
**Public Document**
E&C/OI:  MJK

January 12, 2024

| | |
|---|---|
| **MEMORANDUM TO:** | James Maeder<br>Deputy Assistant Secretary<br>  for Antidumping and Countervailing Duty Operations |
| **THROUGH:** | Alex Villanueva<br>Senior Director, Office I<br>Antidumping and Countervailing Duty Operations |
| **FROM:** | Mary Kolberg<br>International Trade Compliance Analyst, Office I<br>Antidumping and Countervailing Duty Operations |
| **SUBJECT:** | Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Kaylang Phragmites Final Scope Ruling |

## I.    SUMMARY

In accordance with 19 CFR 351.225(h) and 19 CFR 351.225(k)(1), we recommend that the U.S. Department of Commerce (Commerce) determine that certain cabinets and vanities that Nanjing Kaylang Co., Ltd. (Kaylang) manufactures in its facilities in the People's Republic of China (China), as described in its scope application, are subject to the antidumping duty (AD) and countervailing duty (CVD) orders on wooden cabinets and vanities and components thereof from China.[1]  Specifically, as discussed below, we preliminarily determine that Kaylang's cabinets and vanities made from phragmites are subject to the *Orders*.

## II.    BACKGROUND

On February 23, 2023, we received a scope application from Kaylang to determine whether cabinets and vanities made from phragmites that it manufactures in its facilities in China fall within the scope of the *Orders*.[2]  In accordance with 19 CFR 351.225(d)(1), within 30 days after the date that Commerce receives a scope ruling application, it will determine whether to accept or reject the application.  Because Commerce has not rejected Kaylang's scope ruling

---

[1] *See Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Antidumping Duty Order,* 85 FR 22126 (April 21, 2020); *see also Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China:  Countervailing Duty Order,* 85 FR 22134 (April 21, 2020) (collectively, *Orders*).
[2] *See* Kaylang's Letter, "Request for Scope Ruling," dated February 23, 2023 (Kaylang's Scope Application).

application, or initiated a scope inquiry based on the application, the application was deemed accepted and the scope inquiry was initiated on March 28, 2023 in accordance with 19 CFR 351.225(d)(1)(ii).[3] On April 27, 2023, the American Kitchen Cabinet Alliance (the petitioner), filed comments in opposition to Kaylang's Scope Application.[4] On May 11, 2023, Kaylang submitted a response to the Petitioner's Initial Response.[5]

On July 5, 2023, Commerce issued a supplemental questionnaire to Kaylang requesting additional information regarding the factors listed in 19 CFR 351.225(k)(2),[6] and received a timely response.[7] On July 27, 2023, the petitioner filed comments and rebuttal factual information.[8]

On July 6, 2023, in accordance with 19 CFR 351.225(e)(2)(i), we extended the deadline for the final scope ruling by 177 days, until January 19, 2024.[9]

## III.    SCOPE OF THE *ORDERS*

The merchandise subject to these *Orders* consists of wooden cabinets and vanities that are for permanent installation (including floor mounted, wall mounted, ceiling hung or by attachment of plumbing), and wooden components thereof. Wooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo. Wooden cabinets and vanities consist of a cabinet box (which typically includes a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks, and/or shelves) and may or may not include a frame, door, drawers and/or shelves. Subject merchandise includes wooden cabinets and vanities with or without wood veneers, wood, paper or other overlays, or laminates, with or without non-wood components or trim such as metal, marble, glass, plastic, or other resins, whether or not surface finished or unfinished, and whether or not completed.

Wooden cabinets and vanities are covered by these *Orders* whether or not they are imported attached to, or in conjunction with, faucets, metal plumbing, sinks and/or sink bowls, or countertops. If wooden cabinets or vanities are imported attached to, or in conjunction with, such merchandise, only the wooden cabinet or vanity is covered by the scope.

Subject merchandise includes the following wooden component parts of cabinets and vanities: (1) wooden cabinet and vanity frames (2) wooden cabinet and vanity boxes (which typically include a top, bottom, sides, back, base blockers, ends/end panels, stretcher rails, toe kicks,

---

[3] *See* Memorandum, "Deemed Initiation of Scope Inquiry," dated March 28, 2023.
[4] *See* Petitioner's Letter, "Response to Request for Scope Ruling by Nanjing Kaylang Co., Ltd.," dated April 27, 2023 (Petitioner's Initial Response).
[5] *See* Kaylang's Letter, "Response to Comments of American Kitchen Cabinet Alliance," dated May 11, 2023 (Kaylang's Rebuttal Comments).
[6] *See* Commerce's Letter, "Supplemental Questionnaire," dated July 5, 2023.
[7] *See* Kaylang's Letter, Response to Supplemental Questionnaire," dated July 17, 2023 (Kaylang's SQR).
[8] *See* Petitioner's Letter "Comments and Rebuttal Factual Information on Supplemental Response," dated July 27, 2023 (Petitioner's Rebuttal Comments).
[9] *See* Memorandum, "Extension of Deadline for Final Scope Ruling," dated July 6, 2023.

and/or shelves), (3) wooden cabinet or vanity doors, (4) wooden cabinet or vanity drawers and drawer components (which typically include sides, backs, bottoms, and faces), (5) back panels and end panels, (6) and desks, shelves, and tables that are attached to or incorporated in the subject merchandise.

Subject merchandise includes all unassembled, assembled and/or "ready to assemble" (RTA) wooden cabinets and vanities, also commonly known as "flat packs," except to the extent such merchandise is already covered by the scope of antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China*.  *See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018).  RTA wooden cabinets and vanities are defined as cabinets or vanities packaged so that at the time of importation they may include:  (1) wooden components required to assemble a cabinet or vanity (including drawer faces and doors); and (2) parts (*e.g.*, screws, washers, dowels, nails, handles, knobs, adhesive glues) required to assemble a cabinet or vanity. RTAs may enter the United States in one or in multiple packages.

Subject merchandise also includes wooden cabinets and vanities and in-scope components that have been further processed in a third country, including but not limited to one or more of the following:  trimming, cutting, notching, punching, drilling, painting, staining, finishing, assembly, or any other processing that would not otherwise remove the merchandise from the scope of these *Orders* if performed in the country of manufacture of the in-scope product.

Excluded from the scope of these *Orders*, if entered separate from a wooden cabinet or vanity are:

(1) Aftermarket accessory items which may be added to or installed into an interior of a cabinet and which are not considered a structural or core component of a wooden cabinet or vanity. Aftermarket accessory items may be made of wood, metal, plastic, composite material, or a combination thereof that can be inserted into a cabinet and which are utilized in the function of organization/accessibility on the interior of a cabinet; and include:

- Inserts or dividers which are placed into drawer boxes with the purpose of organizing or dividing the internal portion of the drawer into multiple areas for the purpose of containing smaller items such as cutlery, utensils, bathroom essentials, *etc*.
- Round or oblong inserts that rotate internally in a cabinet for the purpose of accessibility to foodstuffs, dishware, general supplies, *etc*.

(2) Solid wooden accessories including corbels and rosettes, which serve the primary purpose of decoration and personalization.

(3) Non-wooden cabinet hardware components including metal hinges, brackets, catches, locks, drawer slides, fasteners (nails, screws, tacks, staples), handles, and knobs.

(4) Medicine cabinets that meet all of the following five criteria are excluded from the scope:

(1) wall mounted; (2) assembled at the time of entry into the United States; (3) contain one or more mirrors; (4) be packaged for retail sale at time of entry; and (5) have a maximum depth of seven inches.

Also excluded from the scope of these *Orders* are:

(1) All products covered by the scope of the antidumping duty order on *Wooden Bedroom Furniture from the People's Republic of China*. See *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order:  Wooden Bedroom Furniture from the People's Republic of China*, 70 FR 329 (January 4, 2005).

(2) All products covered by the scope of the antidumping and countervailing duty orders on *Hardwood Plywood from the People's Republic of China.  See Certain Hardwood Plywood Products from the People's Republic of China:  Amended Final Determination of Sales at Less Than Fair Value, and Antidumping Duty Order*, 83 FR 504 (January 4, 2018); *Certain Hardwood Plywood Products from the People's Republic of China:  Countervailing Duty Order*, 83 FR 513 (January 4, 2018).

Imports of subject merchandise are classified under Harmonized Tariff Schedule of the United States (HTSUS) statistical numbers 9403.40.9060 and 9403.60.8081.  The subject component parts of wooden cabinets and vanities may be entered into the United States under HTSUS statistical number 9403.90.7080.  Although the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of these *Orders* are dispositive.[10]

## IV.    LEGAL FRAMEWORK

When a party files a scope ruling application, Commerce examines the scope language of the order{s} at issue and the description of the product contained in the scope ruling application.[11] Pursuant to Commerce's regulations, in determining whether the scope of an order covers a product, Commerce may make its determination on the basis of the scope language alone where such language is dispositive.[12]

Commerce may also take into account primary interpretive sources in determining a scope ruling, including: the description of the merchandise contained in the petition and investigation; previous or concurrent determinations by Commerce, including prior scope rulings, memoranda, or clarifications pertaining to the order at issue or other orders with the same or similar language; and relevant U.S. International Trade Commission (ITC) determinations pertaining to the orders at issue.[13]  Additionally, Commerce may consider secondary interpretive sources, such as any other determinations of Commerce or the ITC, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence, in determining a scope ruling.[14]

---

[10] *See Orders*.
[11] *See Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010).
[12] *See* 19 CFR 351.225(k)(1).
[13] *See* 19 CFR 351.225(k)(1)(i).
[14] *See* 19 CFR 351.225(k)(1)(ii).

However, to the extent that these secondary interpretive sources conflict with primary interpretive sources under 19 CFR 351.225(k)(1)(i), the primary interpretive sources will normally control.[15] If Commerce determines that these sources are determinative of the matter, it will issue a final scope ruling as to whether the merchandise is covered by the order or orders.[16]

Where Commerce determines that the descriptions of the merchandise in the sources described in 19 CFR 351.225(k)(1) are not dispositive, Commerce will consider the five additional factors set forth at 19 CFR 351.225(k)(2). These factors are: (A) the physical characteristics of the merchandise; (B) the expectations of the ultimate users; (C) the ultimate use of the product; (D) the channels of trade in which the product is sold; and (E) the manner in which the product is advertised and displayed. In the event of a conflict between these factors, Commerce allots greater weight to physical characteristics of the merchandise than to other factors.[17]

Commerce makes scope rulings on a case-by-case basis, and may apply on a producer specific, exporter-specific, or importer-specific basis, or some combination thereof, or to all products from the same country with the same relevant physical characteristics as the product at issue, on a country-wide basis, regardless of the producer, exporter, or importer of the product.[18]

## V.     DESCRIPTION OF MERCHANDISE SUBJECT TO THIS REQUEST

The products subject to Kaylang's Scope Ruling Application are cabinets and vanities made from phragmites, a common reed with various scientific names starting with "Phragmites." This plant is a perennial wetland grass that can grow up to 15 feet high.[19]

Phragmites are cut into specific lengths, dried, ground into particles, mixed with glue, flattened into a sheet and spread to form a surface layer over a core layer. The layers are cold pressed, then hot pressed, sanded, and finished, where melamine paper is applied to the surface using high temperature and high pressure, thus completing the process for phragmite composite board. After the composite board is produced, the cabinet or vanity is produced using traditional furniture production processes.[20]

## VI.    RELEVANT INTERPRETIVE SOURCES

The following interpretive sources are relevant to this inquiry:

<u>U.S. Customs and Border Protection (CBP) Ruling on "Original Hay! Straws" and "Hay! Straws Jumbo"</u>[21]

Here, CBP determined that certain drinking straws imported from China and Ukraine, that were made from phragmites were to enter the United States under HTSUS subheading 1404.90.9090,

---

[15] *Id.*
[16] *See* 19 CFR 351.225(h).
[17] *See* 19 CFR 351.225(k)(2)(ii).
[18] *See* 19 CFR 351.225(m)(1).
[19] *See* Kaylang's Scope Application at 3.
[20] *See* Kaylang's Rebuttal Comments at Exhibit 1; *see also* Kaylang's SQR at Exhibit S-1.
[21] *Id.* at Exhibit 2.

"Vegetable products not elsewhere specified or included: Other: Other." The manufacturing process for the straws included removing the reed grass, sorting, bundling, soaking it, cut into specific straw lengths, washing the straws, rinsing, heating, drying, treating them with ultraviolet light to eliminate pathogens or bacteria, and packing them.

CBP Ruling on Reed Fencing Imported by Lewis Hyman, Inc.[22]

The product in question was 6 feet by 15 feet reed fencing in which the reeds were held together with rows of wire placed at four-inch intervals. CBP classified this product under HTSUS subheading 4421.90.7020, "Other articles of wood; assembled fence sections."

CBP Ruling on Roll-Up Blinds Made from Reeds by Lewis Hyman, Inc.[23]

The product in question was roll-up blinds made from bamboo. The product was a 36" by 72" finished blind consisting of reeds placed side by side and woven together with yarn and included a bamboo top rail, bamboo bottom rail, two textile pull cords, and metal hardware. CBP classified the product under HTSUS subheading 4421.90.4000, "Other articles of wood: wood blinds, shutters, screens and shades, all the foregoing with or without their hardware, other."

CBP Ruling on "Kirei" Boards from China Imported by Celebration Products, dba Kirei U.S.A.[24]

The product in question was composed of layers of sorghum strips (stalks) and poplar veneers. These imported boards could be used as a wall covering, cabinetry, and furniture. The product in question consisted of seven plies, which formed five wood layers. The outer two layers were made of sorghum stalks and the core consisted of two plies of glued sorghum stalks. CBP classified the product under HTSUS subheading 4412.32.3170, "Plywood, veneered panels and similar laminated wood: other plywood consisting solely of sheets of wood, each ply not exceeding 6 mm in thickness: other, with at least one outer ply of nonconiferous wood: other, other." Originally, the importer wanted to classify the product as particle board. However, CBP disagreed, because sorghum stalks had not been reduced to chips or particles, but, rather, were present in their long strip form.

CBP Ruling on "Straw Particle Board with Tongued and Grooved Edges Imported from Canada"[25]

The product in question was made of wheat straw that was manufactured by applying heat and pressure to fine straw particles mixed with resin. The boards to have been imported were two feet by four feet panels. CBP stated that the applicable tariff provision for the straw particle board with tongued and grooved edges was HTSUS subheading 4410.90.0000, "Particle board and similar board of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances; Of other ligneous materials."

---

[22] *See* Petitioner's Initial Response at Exhibit 14.
[23] *Id.* at Exhibit 15.
[24] *Id.* at Exhibit 16.
[25] *Id.* at Exhibit 20.

<u>CBP Ruling on Strawboard from Canada</u>[26]

The product in question consisted of a ¾ inch thick board made primarily of fine straw particles and a resin. The straw was ground into small particles which were then mixed with the resin binder. Heat and pressure applied to the mixture produced straw particle board. CBP classified the product under HTSUS subheading 4410.90.0000, "Particle board and similar board of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances; of other ligneous materials."

<u>World Customs Organization (WCO), Explanatory Notes (2022), Volume 3, Chapter 44</u>[27]

Documentation demonstrating that the WCO classified particle board and other similar boards of wood or other ligneous materials, whether or not agglomerated with resins, as articles of wood under Chapter 44.

<u>HTSUS (2022)</u>[28]

Similarly, the ITC's explanatory notes for Chapter 44, Wood and Articles of Wood; Wood Charcoal, ITC Note 6 states that "subject to note 1 above and except where the context otherwise requires, any reference to 'wood' in a heading in Chapter 44 applies also to bamboo and other materials of a woody nature." Note 1 states that bamboo or other materials of a woody nature used primarily for plaiting, would not be covered in this chapter. However, the ITC, in note 1 above, would not include bamboo or phragmites used for purposes other than plaiting, such as phragmites used to produce composite board or particle board.

## VII.   DISCUSSION OF THE ISSUE

**Whether Kaylang's Cabinets and Vanities Made from Phragmites Are Subject Merchandise**

*Kaylang's Comments*[29]
- Kaylang's cabinets and vanities made from phragmites are not covered by the scope of the *Orders*, because the cabinets and vanities are not made of wood. The *Orders* expressly cover cabinets and vanities made of wood and do not cover products made of other materials.
    - The product in question is made from a vegetable combined with a plastic and would be classified under HTSUS subheading 1404.90.9090.
    - The raw materials are subject to significant processing in the producer's country of origin and there is no further processing in third countries.

---

[26] *Id.* at Exhibit 21.
[27] *See* Petitioner's Initial Response at Exhibit 13.
[28] *Id.* at Exhibit 12.
[29] *See generally* Kaylang's Scope Application.

7

*Petitioner's Rebuttal Comments*[30]
- The *Orders* cover cabinets and vanities made from engineered wood, including particleboard or fiberboard. Kaylang's cabinets and vanities are made from engineered wood (*i.e.*, particleboard or fiberboard) that is produced using the fibers of phragmite reeds. Kaylang's own information shows that an industrial material, reed can be used as a component in the manufacture of medium-density fiberboard and as a source of polymers.
    - Particle board and medium density fiberboard (MDF) may also be made of phragmite reeds. Kaylang's description of the production process of the products at issue make clear that its cabinets and vanities are made from either particleboard or MDF as the production processes are similar.
    - Kaylang's cabinets and vanities made from phragmites are coated with melamine which is also used on wooden boards to make kitchen cabinets.
    - The plain language of the scope states that the subject merchandise includes cabinets and vanities made from "engineered wood products," including those made from "particles" and "fibers," including specifically "particleboard" and "fiberboard."
- The HTSUS further supports the conclusion that cabinets and vanities made from phragmite boards are to be considered made from wood. Note 6 of Chapter 44 states that any reference to "wood" in a heading in this chapter applies to bamboo and other materials of a woody nature (with the exception of any bamboo or materials of a woody nature used for plaiting, which is not the case here).
- Numerous CBP rulings also support that cabinets and vanities made of phragmites should be considered made of "wood," especially the CBP ruling on "Kirei" boards, boards made from wheat straw, and strawboard. CBP has consistently ruled that products from the Poaceae family of grasses (of which phragmites are a part) are to be considered "wood."

*Kaylang's Response to Petitioner's Comments*[31]
- A cabinet made of phragmites is not made of wood and the scope of the *Orders* is limited to articles made of wood. The scope of the *Orders* references "engineered **wood** products and refers to "**wood** particles, fibers, or other **wooden** materials such as plywood, strand board, block board, particle board or fiberboard), or bamboo" (emphasis added).
- The petitioner alleges that reeds are "similar" to timber and can be used as an industrial material. However, the petitioner does not allege that phragmites are timber but simply that they are similar to timber. From this, the petitioner claims that cabinets are made from a phragmite-based engineered wood product. The petitioner implies, but never states, that phragmites are in the wood family, because phragmites are not in the wood family.

**Commerce's Position:** When determining how to proceed in examining whether Kaylang's cabinets and vanities made from phragmites are within the scope of the *Orders*, we first examine the plain language of the scope.[32] The scope explicitly states that "solid wood and engineered

---

[30] *See generally* Petitioner's Initial Response.
[31] *See* Kaylang's Rebuttal Comments at 1-9.
[32] *See* 19 CFR 351.225(k)(1).

8

wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo" are included in the *Order*s.  However, because the scope language does not clearly state whether engineered wood products would include cabinets and vanities made from fibers and particles other than wood, we performed an analysis under 19 CFR 351.225(k)(1)(ii) and examined secondary interpretive sources including explanatory notes of the HTSUS and the WCO.

In examining Chapter 44 of the HTSUS, we find that articles made of bamboo, which, like phragmites, are part of the "poaceae" family of grasses,[33] and other materials of a woody nature, not used for plaiting, are classified as wood articles.  Similarly, the WCO classifies articles made of bamboo and other materials of a woody nature to be classified as wood articles.

To determine whether Kaylang's cabinets and vanities should be considered engineered wood products, we also looked to previous CBP rulings.  Prior rulings demonstrate that CBP also considers straw processed into particle board and boards made of sorghum strips as wood articles.  We disagree with Kaylang that the product in question would be classified under HTSUS subheading 1404.90.9090, Vegetable Products, not elsewhere specified.  Kaylang's cabinets and vanities have undergone sufficient additional processing to not be considered simple vegetable products.

In its supplemental questionnaire response, Kaylang describes its manufacturing process for the manufacture of its composite board which is very similar to the production process for manufacturing particle board.[34]  Kaylang states that its manufacturing process involves cutting the material {phragmites} into specific lengths, drying, crushing the phragmites into finely ground particles.  The particles are then mixed with glue inside the production machine.  The material is then flattened into a sheet and spread to form a surface layer over a core layer.  The layers are combined and cold pressed to form a preliminary product, which is then hot pressed under high temperature and pressure.  After the sheets have been formed, they are sanded to produce a smooth and uniform surface.  Finally, the product is subject to finishing treatment, including the application of melamine paper onto the surface.

In comparison, information from the petitioner demonstrates that particle board can also be produced from phragmites.  For example, the patent for producing reed fiber particle board published in China describes the production process as comprising the following steps:  (1) cutting the reed to a certain size; (2) cutting the material using a reed cutting machine, where one part of the cut material is cooked and softened to obtain the reed fibers, and the other part of the material is crushed again to obtain fine reed shavings; (3) applying different resin adhesives to the reed fibers and the shavings, and drying, air-sorting and paving to form three-layer or multi-layer structural board blank; and (4) pre-pressing the three-layer or multi-layer structural board blank into a continuous flat-pressing hot press to press and produce the reed fiber particle board.[35]

---

[33] *See* Petitioner's Initial Response at 11.
[34] *See* Kaylang's SQR at Exhibit S-1.
[35] *See* Petitioner's Initial Response at 6-7.

As demonstrated above, even though phragmite is not wood, it undergoes a manufacturing process that is very similar to the process used to make particle boards, resulting in the production of phragmite particle board, a ligneous board of a woody nature. In addition, multiple government agencies, including the ITC and CBP have classified articles made of ligneous materials as wood articles, and furniture made of bamboo, which is classified as belonging to the same family of grasses as phragmites, classified as wood. For example, Note 6 of Chapter 44, Wood and Articles of Wood; Wood Charcoal, of the HTSUS published by the ITC states that, "{s}ubject to note 1 above and except where the context otherwise requires, any reference to "wood" in a heading of this chapter applies also to bamboo and other materials of a woody nature." [36] Similarly, CBP ruled twice that straw board would be classified as a wooded article under HTSUS subheading 4410.90.0000, which provides for "particle board and similar board of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances; Of other ligneous materials."[37] In these rulings, CBP found that straw boards from Canada, which were manufactured by applying heat and pressure to fine straw particles mixed with resin, would be classified under this heading. Similarly, cabinets and vanities made from phragmites that are produced by Kaylang undergo a similar process—the phragmites are dried, ground into particles, and mixed with glue before being flattened into a sheet and spread to form a surface layer. Thus, in considering these secondary interpretive sources, we find Kaylang's cabinet and vanities to be within scope of the *Orders*. [38]

We disagree with Kaylang that its cabinets and vanities produced from phragmites should be classified under HTSUS subheading 1404.90.9090, Vegetable Products, not elsewhere specified or included; other; other. While Kaylang references a CBP ruling on phragmite straws which were classified under this HTSUS subheading, the phragmite straws do not undergo a similar level of additional processing and, therefore, are not akin to particle board products.

Based on the foregoing analysis, we find that the cabinets and vanities made from phragmites in Kaylang's Scope Application are within the scope of the *Orders* based on the factors set forth in 19 CFR 351.225(k)(1). Accordingly, for this scope ruling, Commerce finds it unnecessary to consider the additional factors specified in 19 CFR 351.225(k)(2).

VIII.   RECOMMENDATION

For the reasons discussed above, and in accordance with 19 CFR 351.225(d) we recommend finding that Kaylang's cabinets and vanities made from phragmites are covered by the scope of the *Orders*.

---

[36] Note 1(b) of Chapter 44 states that "Bamboo or other materials of a woody nature of a kind used primarily for plaiting, in the rough, whether or not split, sawn lengthwise or cut to length would be included in Chapter 44 but would be included under heading 1401."
[37] *See* Petitioner's Initial Response at Exhibits 20 and 21.
[38] *See* 19 CFR 351.225(k)(1)(ii).

10

Barcode:4490857-01 A-570-106 SCO - Scope Inquiry - Kaylang Phragmites

If the recommendations in this memorandum are accepted, we will notify all interested parties on the scope service list, as directed by 19 CFR 351.225(h). Further, we intend to issue the appropriate instructions to CBP.

☒  ☐
_____    _____
Agree            Disagree

1/12/2024

X  *James Maeder*

Signed by: James Maeder

James Maeder
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations

11