UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| NANJING KAYLANG CO., LTD.,<br><div align="center">*Plaintiff*,</div><br><div align="center">v.</div><br>UNITED STATES,<br><div align="center">*Defendant*,</div><br><div align="center">and</div><br>AMERICAN KITCHEN CABINET ALLIANCE,<br><div align="center">*Defendant-Intervenor*.</div> | Court No. 24-00045 |

**DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Luke A. Meisner
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for American Kitchen Cabinet Alliance*

Dated: December 6, 2024

**Table of Contents**

STATEMENT PURSUANT TO RULE 52.6(c)(1) ................................................................. 2

    I.    Administrative Determination Under Review ................................................. 2

    II.   Issues Presented for Review ............................................................................. 2

STATEMENT OF FACTS ............................................................................................... 2

SUMMARY OF ARGUMENT ........................................................................................ 5

ARGUMENT ................................................................................................................... 6

    I.    Standard of Review ......................................................................................... 6

    II.   Kaylang's Cabinets Are Covered by the Scope Because They Are Made from an Engineered Wood Product .............................................................................. 7

    III.  Commerce Correctly Interpreted the Scope of the Orders ........................... 11

CONCLUSION .............................................................................................................. 13

## Table of Authorities

**Cases**

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ........................................................ 6

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) ................................................... 6

*Duferco Steel, Inc. v. United States*, 296 F.3d 1087 (Fed. Cir. 2002) ........................... 7

*King Supply Co. LLC v. United States*, 674 F.3d 1343 (Fed. Cir. 2012) ...................................... 11

*Loper Bright Enterprises, et al., Petitioners, v. Gina Raimondo, Secretary of Commerce, et al.*, 144 S. Ct. 2244 (2024) ........................................................................ 6

*Marx v. Gen. Revenue Corp.*, 568 U.S. 371 (2013) ............................................. 11, 12

*Meridian Prods., LLC v. United States*, 851 F.3d 1375 (Fed. Cir. 2017) ......................... 7

*Saha Thai Steel Pipe Public Co. Ltd. v. United States*, 101 F.4th 1310 (Fed. Cir. 2024) ............. 7

*United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794 (Fed. Cir. 2020) .......................... 6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................................. 6

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................. 6

**Regulations**

19 C.F.R. 351.225(k)(1)(ii) ....................................................... 5, 8, 9, 11

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE THOMAS J. AQUILINO, JR., SENIOR JUDGE

| | |
|---|---|
| NANJING KAYLANG CO., LTD.,<br><br>               *Plaintiff*,<br><br>     v.<br><br>UNITED STATES,<br><br>               *Defendant*,<br><br>     and<br><br>AMERICAN KITCHEN CABINET ALLIANCE,<br><br>               *Defendant-Intervenor*. | Court No. 24-00045 |

## DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of this Court, Defendant Defendant-Intervenor American Kitchen Cabinet Alliance ("Defendant-Intervenor" or "AKCA") hereby submits its response to the motion for judgment on the agency record filed by Plaintiff Nanjing Kaylang Co., Ltd., ("Plaintiff" or "Kaylang"). *Memorandum of Law in Support of the Rule 56.2 Motion of Plaintiff Nanjing Kaylang Co., Ltd. for Judgment Upon the Agency Record* (ECF No. 21-1) ("Pl.'s Br."). This Court should sustain Commerce's final determination that the scope of *Wooden Cabinets and Vanities from the People's Republic of China* covers cabinets and vanities manufactured in China from phragmite-based engineered wood.

1

## STATEMENT PURSUANT TO RULE 52.6(c)(1)

**I.    Administrative Determination Under Review**

The administrative determination challenged by Plaintiff here is the final scope ruling by the Department of Commerce ("Commerce") finding that cabinets and vanities made from phragmite-based engineered wood are subject to the antidumping and countervailing duty orders on wooden cabinets and vanities from the People's Republic of China (the "Orders"). *See* Commerce Memorandum, *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Kaylang Phragmites Scope Ruling* (Jan. 12, 2024) ("*Scope Ruling*"), P.D. 30.

**II.    Issues Presented for Review**

1)  Whether Commerce correctly determined that cabinets and vanities manufactured in China from phragmite-based engineered wood are covered by the scope of the Orders on *Wooden Cabinets and Vanities from China*, which explicitly includes cabinets, vanities, and component products made substantially of engineered wood.

## STATEMENT OF FACTS

On April 21, 2020, Commerce issued antidumping and countervailing duty orders on wooden cabinets and vanities, and components thereof, from China. *See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order*, 85 Fed. Reg. 22,126 (Dep't Commerce Apr. 21, 2020) ("*AD Order*"); *Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Countervailing Duty Order*, 85 Fed. Reg. 22,134 (Dep't Commerce Apr. 21, 2020) ("*CVD Order*"). The scope of the Orders states that "{w}ooden cabinets and vanities and wooden components are made substantially of wood products, including solid wood and engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo." *AD Order*, 85 Fed. Reg. at

22,132; *CVD Order*, 85 Fed. Reg. at 22,135.

As the scope states, engineered wood products include "particle board" and "fiberboard." *See, e.g., AD Order*, 85 Fed. Reg. at 22,132. Particle board is manufactured by pressing and extruding materials such as wood chips, sawmill shavings or sawdust, straw particles, or reed shavings, combined with a synthetic resin or other suitable binder. *See AKCA Response to Scope Request* (April 27, 2023), P.D. 7 at Exhibits 2, 3, 20, and 21. Particle board may be made with reed fibers and shavings. One patent for "reed particle board" describes the manufacturing process as: (1) cutting the reed to a certain size; (2) cutting the resulting material using a reed cutting machine, where one part of the cut material is cooked and softened to obtain the reed fibers, and the other part of the material is crushed again to obtain fine reed shavings; (3) combining resin with the reed fibers and the shavings to form three-layer or multilayer structural boards; and (4) pre-pressing the boards in a continuous flat-pressing hot press to produce the reed fiber particle board. *Id.* at Exhibit 3. Similarly, medium-density fiberboard ("MDF") is another type of engineered wood that is manufactured by breaking down plant materials into fibers, often in a defibrator, combining the fibers with wax and a resin binder, and forming panels by applying high temperature and pressure. *Id.* at Exhibit 4. Like particle board, MDF can be produced from plants in the Poaceae family of grasses, including bamboo, bagasse, and phragmite reeds. *Id.* at 7-8, Exhibits 5-9.  In one study published in 2004, "MDF was produced from Reed (Phragmites australis)" and the resulting physical and mechanical properties of the MDF were determined according to the relevant industry standards. *Id.* at Exhibit 8. In a later study published in 2010, the detailed characteristics of reed were analyzed, and the effects of density and adhesive content on the physical and mechanical properties of reed-based MDF were investigated. *Id.* at Exhibit 9.

On February 23, 2023, Kaylang requested that Commerce determine whether certain cabinets that Kaylang manufactures in China are covered by the Orders. Kaylang Request for Scope Ruling (Feb. 23, 2023), P.D. 1. In its scope application, Kaylang stated that its cabinets are made of compressed "mats" of "phragmites," which are a "group of common reeds" described as a "perennial wetland grass that can grow up to 15 feet high." *Id*. at 3. Phragmites belong to the "Poaceae family of grasses," which also includes bamboo and bagasse. *See id*. at Exhibit 1; *AKCA Response to Scope Request*, P.D. 7 at 7. In its response to a supplemental questionnaire from Commerce, Kaylang further disclosed that its cabinets are made from "phragmite composite board." Kaylang Response to Supplemental Questionnaire (Jul. 17, 2023) ("*Kaylang SQR*"), P.D. 21 at 1. Kaylang explained that these boards are produced by cutting, drying, and crushing phragmites into "finely ground" "particles {that} are then mixed with glue inside the production machine {and then} flattened into a sheet and spread to form a surface layer over a core layer," with these layers next both cold and hot pressed "to bond the adhesive and the material" before undergoing finishing steps. *Id.* at Exhibit S-1.

On January 12, 2024, Commerce issued its final scope ruling, determining that the cabinets Kaylang manufactures in China from phragmite composite boards are covered by the scope of the Orders. *See* Commerce Memorandum, *Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Kaylang Phragmites Scope Ruling* (Jan. 12, 2024) ("*Scope Ruling*"), P.D. 30. Commerce explained that the plain language of the scope includes cabinets and vanities produced from "engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo." *Id.* Commerce found that Kaylang's phragmite composite boards are a type of engineered wood because the secondary interpretative

4

sources Commerce considered pursuant to 19 C.F.R. 351.225(k)(1)(ii) – such as Customs and Border Protection ("CBP") rulings and explanatory notes on classifications from the World Customs Organization ("WCO") and the International Trade Commission ("ITC") – demonstrate that phragmite-based composite boards are a type of "engineered wood." *See id.* Commerce also examined Kaylang's manufacturing process for phragmite composite board and found that it "is very similar to the production process for manufacturing particle board." *Id.* at 9.

This challenge by Kalyang followed.

## SUMMARY OF ARGUMENT

Commerce correctly determined that cabinets produced in China from phragmite composite boards are covered by the scope of the Orders. The scope explicitly includes cabinets, vanities, and components thereof produced from engineered wood, including plywood, particle board, and fiberboard. Commerce correctly found that phragmite composite boards are a type of engineered wood based on the record evidence and the secondary interpretative sources it examined, including the ITC's explanatory notes of Chapter 44 of the Harmonized Tariff System of the United States ("HTSUS"), previous CBP rulings on tariff classification, and WCO explanatory notes, which all interpret the phrase "wood articles" in the relevant context to include "materials of a woody nature" such as reeds and grasses.

Plaintiff's argument on appeal that Commerce's scope ruling was inconsistent with the unambiguous language of the scope lacks any merit and should be rejected by this Court. Indeed, Plaintiff's argument that the *expressio unius* canon of construction limits Commerce's interpretation of the scope is completely misplaced. Therefore, the Court should sustain Commerce's final scope ruling.

**ARGUMENT**

**I.    Standard of Review**

This Court will uphold a determination by Commerce on the scope of an antidumping or countervailing duty order unless that determination is unsupported by substantial evidence or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). A decision is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Additionally, "parties challenging Commerce's scope determinations under substantial evidence review confront a high barrier to reversal." *United Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 798 (Fed. Cir. 2020). This high barrier arises from the fact that, as the Federal Circuit has "consistently emphasized … Commerce is entitled to substantial deference when interpreting its own antidumping duty orders because the meaning and scope of such orders is within Commerce's particular expertise and special competence." *Id*.

The recent Supreme Court decision in *Loper Bright* does not mean that Commerce is not entitled to deference in the context of a scope determination. As Plaintiff notes, *Loper Bright* states that "courts need not and under the APA may not defer to an agency interpretation *of the law* simply because a *statute* is ambiguous." *Loper Bright Enterprises, et al., Petitioners, v. Gina Raimondo, Secretary of Commerce, et al.*, 144 S. Ct. 2244, 2273 (2024). *Loper Bright* addresses statutory interpretation, not Commerce's interpretation of the scope of an antidumping or

countervailing duty order.

II.    **Kaylang's Cabinets Are Covered by the Scope Because They Are Made from an Engineered Wood Product**

The gist of Kaylang's argument before this Court is that its cabinets are not covered by the scope of the Orders because they are made of phragmites, which are reeds and therefore not wood, and the scope only covers "wooden" cabinets that are made substantially of wood. As demonstrated below, however, the scope not only covers cabinets made of "solid wood" but also cabinets made from "engineered wood." Kaylang's cabinets are made substantially of phragmite composite boards that are a type of engineered wood product. Thus, they are covered by the scope of the Orders.

The plain language of the scope of an antidumping or countervailing duty order is the "cornerstone" of Commerce's analysis in a scope inquiry. *Saha Thai Steel Pipe Public Co. Ltd. v. United States*, 101 F.4th 1310, 1323 (Fed. Cir. 2024) (quoting *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). However, as the Federal Circuit has recognized, "{i}f the scope language itself does not clearly answer the scope question, Commerce continues its interpretation to understand the meaning of the scope language by consulting criteria identified in 19 C.F.R. §351.225(k)(1)." *Id.* at 1324 (citing *Meridian Prods., LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017)). In this case, Commerce properly followed this procedure to determine first that the plain language of the scope at issue did not address the scope question raised by Kaylang, and then to determine that, after evaluating secondary interpretative sources per 19 C.F.R. §351.225(k)(1), Kaylang's cabinets and vanities of phragmite-based engineered wood were covered by the scope of the Orders.

The scope of the Orders states explicitly that:

Wooden cabinets and vanities and wooden components are made substantially of wood

7

products, including solid wood and *engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard)*, or bamboo.

     *Scope Ruling*, P.D. 30 at 2 (emphasis added).

As Commerce found based on the record, Kaylang's cabinets and vanities are manufactured from "phragmite composite board." *Id.* at 5. This is Kaylang's term for what is clearly a particle board or MDF made from phragmite particles and fibers. *See AKCA RFI Comments*, P.D. 25 at 4-5. Indeed, Commerce found that phragmite composite board is manufactured using a process "very similar to the production process for manufacturing particle board," a type of engineered wood explicitly named in the scope language. *Scope Ruling* at 9 (citing to *Kaylang SQR* at Exhibit S-1).

     In its final scope ruling, Commerce found that the plain language of the scope did not clearly state "whether engineered wood products would include cabinets and vanities made from fibers and particles other than wood." *Id.* Commerce therefore considered "secondary interpretative sources" pursuant to 19 C.F.R. §351.225(k)(1) to determine whether such products were covered by the scope. *Id.* Pursuant to 19 C.F.R. 351.225(k)(1)(ii), Commerce may consider "secondary interpretive sources … such as any other determinations of {Commerce} or the Commission not identified above, Customs rulings or determinations, industry usage, dictionaries, and any other relevant record evidence" to make its determination in a scope inquiry. 19 C.F.R. 351.225(k)(1)(ii).

     Here, Commerce identified a number of CBP rulings which classified products made from reeds – specifically, "reed fencing" and "roll-up blinds made from bamboo" – as "Other articles of wood." *Scope Ruling*, P.D. 30 at 6 (citing *AKCA Response to Scope Request* at Exhibits 14-15). Commerce also identified CBP rulings classifying plywood made of sorghum

stalks, and particle board made out of straw, as "wood" products. *Id.* at 6-7 (citing *AKCA Response to Scope Request* at Exhibits 16, 20, and 21). Commerce highlighted in its analysis that "CBP ruled twice that straw board would be classified as a wooded article under HTSUS subheading 4410.90.0000, which provides for 'particle board and similar board of wood or other ligneous materials …'", and that similar processes were used to manufacture the straw particle boards thus classified in the CBP rulings and the phragmite composite boards used in the products at issue in this case. *Id.* at 10. In particular, in Customs Ruling NY E82859, boards made from wheat straw that was mixed with resin and heated and pressed were classified under HTSUS 4410.90.00 (1999) "Particle board and similar board of wood or other ligneous materials, whether or not agglomerated with resins or other organic binding substances: Of other Ligneous materials." *AKCA Response to Scope Request* at Exhibit 20. Similarly, in Customs Ruling NY D84977, the merchandise, which was described as a board made of straw particles and resin, which is then heated and pressed to produce straw particle board, was classified under HTSUS 4410.90.00. *Id.* at Exhibit 21.

Commerce also considered "other relevant record evidence" in the form of the ITC's explanatory notes for Chapter 44 of the HTSUS and the WCO's explanatory notes for Chapter 44 of the Harmonized System. 19 C.F.R. 351.225(k)(1)(ii); *see Scope Ruling*, P.D. 30 at 7. Specifically, Commerce highlighted that "Note 6 of Chapter 44, Wood and Articles of Wood; Wood Charcoal, of the HTSUS states that, '{s}ubject to note 1 above and except where the context otherwise requires, any reference to 'wood' in a heading of this chapter applies also to bamboo and other materials of a woody nature.'" *Scope Ruling*, P.D. 30 at 10; *see AKCA Response to Scope Request*, P.D. 7 at Exhibit 12. Since phragmites and bamboo are both members of the Poaceae family of grasses, if bamboo is a "material{} of a woody nature," then

9

the phrase "other materials of a woody nature" must also be read as including phragmites. *AKCA Response to Scope Request*, P.D. 7 at Exhibit 12. Additionally, the WCO's explanatory notes ("EN") for HS Chapter 44 explain that particle board and fiber board may be produced from "other ligneous materials such as fragments obtained from bagasse, bamboo, cereal straw or from flax or hemp shives" (in the case of particle board classified under 44.10) or from "defibred ligno-cellulosic material (obtained e.g., from bagasse or bamboo)" (for fiber board classified under 44.11). *Id.* at Exhibit 13.

The EN also provide further explanation as to what products are covered under heading 44.10 and 44.11. In particular, the EN states the following with respect to heading 44.10:

> Particle board is a flat product manufactured in various lengths, widths and thicknesses by pressing or extrusion. It is usually made from wood chips or particles obtained by the mechanical reduction of roundwood or wood residues. It may also be produced from other ligneous materials such as fragments obtained from ***bagasse, bamboo, cereal straw or from flax or hemp shives***. Particle board is normally agglomerated by means of an added organic binder, usually a thermosetting resin, which generally does not exceed 15 % of the weight of the board.

*Id.* (emphasis added). Similarly, the EN states the following with respect to heading 44.11:

> Fibreboard is most often manufactured from wood chips which have been mechanically defibred (defibrated) or steam exploded or from other defibred ligno-cellulosic material (obtained ***e.g., from bagasse or bamboo***). The fibres making up the board are recognisable under microscopic examination. They are bonded together in the board by felting and by their own adhesive properties, generally deriving from their lignin content.

*Id.* (emphasis added). Like bamboo and phragmites, bagasse is also a member of the Poaceae family of grasses. *See id.* at 7 and Exhibit 5. The bottom line is that the HTSUS and the EN recognize both particleboard and fiberboard made from materials in the Poaceae grass family (*e.g.*, bagasse, bamboo, phragmite reeds) to be "engineered wood." This supports the conclusion that cabinets and vanities made from phragmite MDF are covered by the scope of the Orders.

In sum, substantial evidence on the record supports Commerce's determination that the reference to "engineered wood" in the scope of this Order includes phragmite composite boards and thus that Kaylang's cabinets produced from phragmite composite boards are covered by the scope of the Order.

## III.    Commerce Correctly Interpreted the Scope of the Orders

There is no merit to Kaylang's contentions that Commerce has somehow incorrectly interpreted the scope of the Orders in a way that expands its original terms to encompass its cabinets made from phragmite composite boards.

As Plaintiff notes, "Commerce cannot interpret an antidumping order so as to change the scope of that order, nor can Commerce interpret an order in a manner contrary to its terms." Pl.'s Br. at 7 (citing *King Supply Co. LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012)). However, despite Plaintiff's claims, Commerce's interpretation of the scope of the Orders is not contrary to, and does not change, the scope. As discussed above, the terms of the scope explicitly state that cabinets made of "engineered wood" were subject to the Orders. *Scope Ruling*, P.D. 30 at 2. Commerce's analysis of secondary interpretive sources on the record pursuant to 19 C.F.R. 351.225(k)(1)(ii) reasonably interprets "engineered wood" to include phragmite-based particle board and fiberboard.

The Court should reject Plaintiff's argument that the "legal maxim '*{e}xpressio unius exclusio alterius*' ('the inclusion of one thing implies the exclusion of another') is also applicable in this case." Pl.'s Br. at 9 (citing *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 392 (2013)). This argument is misplaced, since *expressio unius* is a canon of construction for *statutory* interpretation. Indeed, the *Marx* opinion itself states that:

> The *expressio unius* canon … invoke{d} does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it," *Barnhart v.*

11

> *Peabody Coal Co.,* 537 U.S. 149, 168, 123 S.Ct. 748, 154 L.Ed.2d 653, and can be overcome by "contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion," *United States v. Vonn,* 535 U.S. 55, 65, 122 S.Ct. 1043, 152 L.Ed.2d 90.

> *Marx*, 568 U.S. at 372.

Plaintiff challenges Commerce's interpretation of the scope of an antidumping duty order, not a statute passed by Congress, so this canon of construction has little if any relevance.

However, even if applying the theory of *expressio unius* to Commerce's interpretation of its scope order were appropriate, it would not mean that cabinets made from phragmite-based engineered wood are excluded from the scope of the Orders. According to Kaylang, "the scope expressly identifies Wood and Bamboo and does not identify any other material. … If other materials {such as phragmites} were to be included, they would have been identified in the scope." Pls. Br. at 8. First of all, the scope not only includes wood and bamboo. It also expressly includes "engineered wood." Moreover, it is clear from the fact that Commerce had to engage in the scope analysis at issue that it had not "considered the unnamed possibility" – *i.e.*, the importation of wooden cabinets and vanities made from phragmite-based engineered wood – "and meant to say no to it." *Marx*, 568 U.S. at 372. Furthermore, the numerous CBP rulings, ITC and WCO explanatory notes on tariff classification of "wood articles," and other record evidence are all "contrary indications" that Commerce did not "mean to signal any exclusion" by not explicitly addressing the inclusion of engineered wood made from phragmites, or other reeds or grasses, in the scope of the Orders. As discussed above, since "engineered wood" includes engineered wood produced from "materials of a woody nature" or "other ligneous materials," the scope language necessarily encompasses products such as phragmite composite board without having to specifically name them. *Id.*; *Scope Ruling* at 6-7. In sum, by expressly naming cabinets made from solid wood, engineered wood, and bamboo in the scope of Orders,

Commerce did not intend to exclude cabinets made from phragmite composite boards.

## **CONCLUSION**

For the foregoing reasons, this Court should affirm Commerce's scope determination that

Kaylang's cabinets and vanities of phragmite-based engineered wood are covered by the scope

of *Wooden Cabinets and Vanities from China*.

Respectfully submitted,

Luke A. Meisner

Luke A. Meisner
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh Street, NW
Suite 500
Washington, DC 20001
(202) 223-1700

*Counsel for American Kitchen Cabinet Alliance*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 3,578 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in the Standard Chambers Procedures.

_Luke A. Meisner_
Luke A. Meisner, Esq.

Dated: December 6, 2024