Slip Op. 25-19

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - -x    Senior Judge Aquilino

NANJING KAYLANG CO., LTD.,                 :

                  Plaintiff,    :

              v.                 :    Court No. 24-00045

UNITED STATES,                             :

                Defendant,    :

            -and-              :

AMERICAN KITCHEN CABINET ALLIANCE,         :

         Intervenor-Defendant.    :

- - - - - - - - - - - - - - - - - - -x

Opinion

[Plaintiff's motion for judgment upon
 agency record denied; action dismissed.]

Decided: February 21, 2025


    David J. Craven, Craven Trade Law LLC, Chicago, IL, for the
plaintiff.

    Ashley Akers, Trial Attorney, Commercial Litigation Branch,
Civil Division, U.S. Department of Justice, Washington, D.C., for
the defendant.  With her on the brief Brian M. Boynton, Principal
Deputy Assistant Attorney General, Civil Division, Patricia M.
McCarthy, Director, and Tara K. Hogan, Assistant Director.  Of
counsel on the brief Heather Holman, Attorney, Office of Chief
Counsel for Enforcement and Compliance, U.S. Department of
Commerce, Washington, D.C.

    Luke A. Meisner and Alessandra A. Palazzolo, Schagrin
Asssociates, Washington, D.C., for the intervenor-defendant.

AQUILINO, Senior Judge:  The plaintiff contests the final scope ruling of defendant International Trade Administration ("ITA"), U.S. Department of Commerce, that its products, manufactured in the People's Republic of China ("PRC"), are subject to the 2020 antidumping-duty ("AD") and countervailing-duty ("CVD") orders on Wooden Cabinets and Vanities and Components Thereof therefrom.[1]  See Memorandum, "Wooden Cabinets and Vanities and Components Thereof from the People's Republic of China: Kaylang Phragmites Scope" (Dep't Commerce Jan. 12, 2024)[2], Public Record ("P.R.") 30 ("Scope Ruling").

The American Kitchen Cabinet Alliance ("AKCA"), intervening in support of that ruling alongside the defendant, opposes plaintiff's interposed USCIT Rule 56.2 motion for judgment on the agency record.[3]

---

[1]  See Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Antidumping Duty Order, 85 Fed.Reg. 22126 (Dep't Commerce April 21, 2020) ("AD Order"); Wooden Cabinets and Vanities and Components Thereof From the People's Republic of China: Countervailing Duty Order, 85 Fed.Reg. 22134 (Dep't Commerce April 21, 2020) ("CVD Order") (collectively, "Orders").

[2]  Not published in the Federal Register.

[3]  See Pl's Mot. J. on Agency Rec. ("Pl's Br."), ECF No. 21; Def's Resp. to Pl's Mot. J. on Agency Rec. ("Def's Resp."), ECF. No. 23; Int-Def's Resp. to Pl's Mot. J. on Agency Rec. ("Int-Def's Resp."), ECF No. 22.  Plaintiff did not file a reply brief.

I

At issue is ITA's interpretation of the 2020 AD and CVD

Orders that encompass

> [w]ooden cabinets and vanities and wooden components
> . . . made substantially of wood products, including
> solid wood and engineered wood products (including those
> made from wood particles, fibers, or other wooden
> materials such as plywood, strand board, block board,
> particle board, or fiberboard), or bamboo.

AD Order, 85 Fed.Reg. at 22132; CVD Order, 85 Fed.Reg. at 22135.


Based on Nanjing Kaylang's Scope Ruling Application, P.R.

1, ITA's Scope Ruling describes its products as

> cabinets and vanities made from phragmites, a common reed
> with various scientific names starting with "Phragmites."
> This plant is a perennial wetland grass that can grow up
> to 15 feet high.
>
> Phragmites are cut into specific lengths, dried, ground
> into particles, mixed with glue, flattened into a sheet
> and spread to form a surface layer over a core layer. The
> layers are cold pressed, then hot pressed, sanded, and
> finished, where melamine paper[4] is applied to the
> surface using high temperature and high pressure, thus
> completing the process for phragmite composite board.
> After the composite board is produced, the cabinet or
> vanity is produced using traditional furniture production
> processes.

Scope Ruling at 5 (footnotes omitted).


Nanjing Kaylang argued that its cabinets and vanities

produced from phragmites should be classified under HTSUS

---

[4]  Melamine is a plastic.  See P.R. 1 at 3.

subheading 1404.90.9090, Vegetable Products, not elsewhere specified or included; other; other. See id. at 7. ITA ultimately determined that the cabinets manufactured in the PRC from phragmite composite boards are covered by the scope of the Orders. Id. at 10.

Explaining its rationale, ITA acknowledged that the scope's language includes cabinets and vanities produced from "engineered wood products (including those made from wood particles, fibers, or other wooden materials such as plywood, strand board, block board, particle board, or fiberboard), or bamboo", id. at 2, but reasoned that the language does not clearly state "whether engineered wood products would include cabinets and vanities made from fibers and particles other than wood". To ITA's thinking, "engineered wood" is ambiguous, thus necessitating resort to considering secondary sources pursuant to 19 C.F.R. 351.225(k)(1)(ii). Id. at 9. The secondary interpretative sources ITA then considered, such as Customs and Border Protection ("CBP") rulings and explanatory notes on classifications from the World Customs Organization ("WCO") and the International Trade Commission ("ITC"), persuaded it that plaintiff's "phragmite composite" boards are a type of "engineered wood." See id.

ITA also examined plaintiff's manufacturing process for phragmite composite board and found that it "is very similar to the production process for manufacturing particle board."  Id. at 9.

This appeal ensued.

## II

Jurisdiction herein is pursuant to 28 U.S.C. §1581(c). This action concerns "[a] determination by [ITA] as to whether a particular type of merchandise is within the class or kind of merchandise described in an . . . antidumping or countervailing duty order." 19 U.S.C. §1516a(a)(2)(B)(vi).  In such a matter, the standard of judicial review is whether the final determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  Id. §1516a(b)(1)(B)(i).  And in that review, ITA's Scope Ruling is presumed to be correct, with the burden on the plaintiff to prove otherwise.  28 U.S.C. §2639(a)(1).

## III

To clarify whether a particular product is within the scope of an unfair trade order, ITA will issue a scope ruling.  See 19 C.F.R. §351.225(a).  Its inquiry begins with the relevant scope language to determine whether it is plain or ambiguous.  See OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed.Cir. 2020).  If it

is unambiguous, the plain meaning obviously controls the outcome. Id. When it is ambiguous, since no specific statute addresses the interpretation of an order's scope, ITA is guided by case law and agency regulations. See Meridian Prods., LLC v. United States, 851 F.3d 1375, 1382 (Fed.Cir. 2017); 19 C.F.R. §351.225. These sources aid ITA's inquiry:

> (A) The descriptions of the merchandise contained in the petition pertaining to the order at issue;
>
> (B) The descriptions of the merchandise contained in the initial investigation pertaining to the order at issue;
>
> (C) Previous or concurrent determinations of the Secretary, including prior scope rulings, memoranda, or clarifications pertaining to both the order at issue, as well as other orders with same or similar language as that of the order at issue; and
>
> (D) Determinations of the Commission pertaining to the order at issue, including reports issued pursuant to the Commission's initial investigation.

19 C.F.R. § 351.255(k)(1)(i).

ITA may also consider secondary interpretive sources, including: any other of its determinations or by the ITC; rulings or determinations by CBP; industry usage; dictionaries; and any other relevant record evidence. Id. § 351.255(k)(1)(ii). If there is a conflict between such secondary interpretive sources and the primary interpretive sources of this section, the primary

interpretive sources will normally govern in determining whether a product is covered by the scope of the order at issue. <u>Id</u>.

Finally, if the (k)(1) sources do not dispositively answer the question, ITA may consider the (k)(2) factors[5]:

   (i) The physical characteristics of the product;

   (ii) The expectations of the ultimate purchasers;

   (iii) The ultimate use of the product;

   (iv) The channels of trade in which the product is sold; and

   (v) The manner in which the product is advertised and displayed.

19 C.F.R. §351.225(k)(2). <u>Id</u>.

In this process, ITA cannot interpret the scope so as to change its intended meaning, nor can it interpret the language in a manner contrary to the unfair trade order's terms overall. <u>See King Supply Co. LLC v. United States</u>, 674 F.3d 1343, 1348 (Fed.Cir. 2012); <u>Eckstrom Indus., Inc. v. United States</u>, 254 F.3d 1068, 1072 (Fed.Cir. 2001). In other words, when a party challenges a scope determination, in ruling on whether ITA's decision is unsupported by substantial evidence or not in accordance with law, the Court

---

[5] <u>See</u> <u>Diversified Products Corp. v. United States</u>, 6 CIT 155, 162, 572 F.Supp. 883, 889 (1983).

must determine whether the scope of the order "contain[s] language
that specifically includes the subject merchandise or may be
reasonably interpreted to include it." <u>Duferco Steel, Inc. v.
United States</u>, 296 F.3d 1087, 1089 (Fed.Cir. 2002).

IV

The scope of the <u>Orders</u> encompasses

> wooden cabinets and vanities that are for permanent
> installation (including floor mounted, wall mounted,
> ceiling hung or by attachment of plumbing), and wooden
> components thereof. Wooden cabinets and vanities and
> wooden components are made substantially of wood
> products, including solid wood and engineered wood
> products (including those made from wood particles,
> fibers, or other wooden materials such as plywood, strand
> board, block board, particle board, or fiberboard), or
> bamboo....

<u>Scope Ruling</u> at 2.

Given such language, the plaintiff argues that the scope
of the <u>Orders</u> is limited to articles of wood. It submits that the
cabinets in question were made out of phragmites, which ITA
specifically and clearly found were "not wood". Plaintiff's
position, thus, is that

> [t]he first sentence of the scope expressly references
> "wooden" as the characterization of the term cabinet and
> also the "wooden" components. The second sentence again
> refers to wooden cabinets made substantially of wood
> products and engineered wood products including solid
> wood and engineered wood products. The scope then
> further characterizes the engineered wood products as

> those made from wood particles, fibers, or other wooden
> materials such as plywood, strand board, block board,
> particle board, or fiberboard[ ].  The scope then also
> names bamboo, and only bamboo[,] as an alternate
> material[ ].  In other words, every sentence of the scope
> expressly references wood or is characterized by the word
> wood or is another expressed material.   There is no
> rational or reasonable interpretation that the scope
> includes materials not made of wood.

Pl's 56.2 Br. at 8.

        Therefore, according to the plaintiff, the sole question
here is whether "non-wood" products are within or without the scope
of the Orders.  Given ITA's finding that phragmite is not wood,
plaintiff especially maintains that ITA improperly expanded the
term "composite board" in the scope of the Orders to include
composite board not made of "wood".  Id. at 2.

        The plaintiff is correct as to ITA's observation that
phragmite is "not wood" for purposes of the Scope Ruling.  However,
ITA's focus was not on phragmite, per se, but on what it could be
processed into:

> As demonstrated above, even though phragmite is not wood,
> it undergoes a manufacturing process that is very similar
> to the process used to make particle boards, resulting in
> the production of phragmite particle board, a ligneous
> board of a woody nature.

Scope Ruling at 10.  Although redundant, "ligneous" succinctly
captures ITA's rationale, since it means "[o]f the nature of wood;

woody: said _esp_. of plants and their texture (opposed to _herbaceous_)." _Ligneous_, _The Oxford English Dictionary_ (2d ed. 1989) ("_OED_"), Vol. VIII at 941. The intervenor-defendant also explains that

> the scope not only covers cabinets made of "solid wood" but also cabinets made from "engineered wood." Kaylang's cabinets are made substantially of phragmite composite boards that are a type of engineered wood product. Thus, they are covered by the scope of the Orders.

Int-Def's Resp. at 7.

This court can agree with ITA that "engineered wood products" is ambiguous. _See_ _Scope Ruling_ at 9. A hyphen would have helped clarify whether the scope encompasses "engineered-wood products" or "engineered wood-products". To the extent that the concept of engineering encompasses not only invention or problem-solving but practical application in creation or refinement,[6] for the purpose of the _Orders_' scope, "engineered wood products" must

---

[6] "Engineering", of course, is "the science by which the properties of matter and the sources of energy in nature are made useful to man", Webster's Third New International Dictionary Unabridged 752 (1981) ("Webster's"), and so to "engineer" in the transitive sense means "to use specialized knowledge or skills to develop (a complicated system or process) so as to fulfil specified criteria or perform particular functions; _esp_. to design and construct (a large-scale machine, structure, etc.), typically for public or industrial use." _Engineer_, oed.com, https://www.oed.com/search/dictionary/?scope=Entries&q=Engineer (last visited this date); _cf_. _OED_, Vol. V at 252.

at least amount to an artfully contrived (i.e., invented) type of "wood", for that is the term employed.  In its natural state, technically speaking, "wood" is "[t]he hard compact fibrous substance lying between the bark outside and the pith within" (OED, Vol. XX at 502), or "the hard fibrous substance that makes up the greater part of the stems and branches of trees or shrubs beneath the bark, is found to a limited extent in herbaceous plants, and consists technically of the aggregated xylem elements intersected in many plants with the rays", Webster's at 2630.  That hard fibrous substance – cellulose fiber – is the basic building-block shared by all Plantae – one of the "five kingdoms" of living organisms.  E.g., Bo Madsen and Kristofer Gamstedt, Wood versus Plant Fibers: Similarities and Differences in Composite Applications, 1 Advances in Materials Science and Engineering (May 14, 2013) at 2, available at https://onlinelibrary.wiley.com/doi/ 10.1155/2013/564346 (last visited this date).

There are gradations thereof, as the plaintiff would argue (e.g., the notable distinctions between wood and plant fibers would include higher hemicellulose and lignin content and lower cellulose crystallinity in wood fibers versus plant fibers).  See id.  That is certainly true of unprocessed fiber in its natural state.  However, the focus of this action is processed fiber and

the scope language of "engineered wood products".  And the subject
merchandise includes cabinets and vanities made from "engineered
wood products," including those made from "particles" and "fibers,"
including specifically "particleboard" and "fiberboard.".  See,
e.g., AD Order, 85 Fed.Reg. at 22132.  If ejusdem generis were
appropriate at this point, that doctrine would limit such "fibers"
only to wood fibers.  But, the term employed in the scope language
is just that: "fibers" -- set apart from the other terms by commas
as part of a series.  The term appears unmodified and unqualified,
and this court will not read into it any further qualification,
when it would have been a simple matter for the domestic industry
to clearly state "wood fibers" if such fibers had been their scope
intent.  Cf. Douglas D. Stokke, Qinglin Wu, and Guangping Han,
Introduction to Wood and Natural Fiber Composites (Christian V.
Stevens ed., John D. Wiley & Sons, Ltd. 2014 ) at 2 ("[w]hile it
may in some respects resemble the wood of trees, it is generally
agreed that monocots such as coconut palm stems do not contain wood
per se, but are said to be composed of 'woody material'").

    "Engineered wood products", incorporating wood particles,
fibers, or other wooden materials, as well as particle board and
fiberboard products, are accurately described in the Scope Ruling

by its referential use of "ligneous," which in turn illuminates a broader intended meaning of "wood" as employed in the scope of the Orders: the Scope Ruling describes phragmite particle board as "a ligneous board of a woody nature" (highlighting added).  Further, the scope of the Orders broadly covers "[w]ooden cabinets and vanities and wooden components" (highlighting added).  In addition to the obvious sense of "wooden," that word also means "resembling wood in stiffness and lack of resilience".  Wooden, Webster's at 2631 (highlighting added).  ITA's Scope Ruling appears to have interpreted the Orders as conveying both meanings, which is not an unreasonable interpretation.

Furthermore, as AKCA points out, the type of "particle board" that the plaintiff contends is outside the scope of the Orders was not unknown in the industry at the time the scope language was drafted. See Int-Def's Resp. at 3.  Describing particle board to ITA as manufactured by pressing and extruding materials, such as wood chips, sawmill shavings or sawdust, straw particles, or reed shavings, combined with a synthetic resin or other suitable binder, AKCA explained that

> particle board . . . may be made with reed fibers and
> shavings.  One patent for "reed particle board" describes
> the manufacturing process as: (1) cutting the reed to a
> certain size; (2) cutting the resulting material using a

reed cutting machine, where one part of the cut material
is cooked and softened to obtain the reed fibers, and the
other part of the material is crushed again to obtain
fine reed shavings; (3) combining resin with the reed
fibers and the shavings to form three-layer or multilayer
structural boards; and (4) pre-pressing the boards in a
continuous flat-pressing hot press to produce the reed
fiber particle board. Id. at Exhibit 3. Similarly,
medium-density fiberboard ("MDF") is another type of
engineered wood that is manufactured by breaking down
plant materials into fibers, often in a defibrator,
combining the fibers with wax and a resin binder, and
forming panels by applying high temperature and pressure.
Id. at Exhibit 4.  Like particle board, MDF can be
produced from plants in the Poaceae family of grasses,
including bamboo, bagasse, and phragmite reeds.  Id. at
7-8, Exhibits 5-9.  In one study published in 2004, "MDF
was produced from Reed (Phragmites australis)" and the
resulting physical and mechanical properties of the MDF
were determined according to the relevant industry
standards.  Id. at Exhibit 8.  In a later study published
in 2010, the detailed characteristics of reed were
analyzed, and the effects of density and adhesive content
on the physical and mechanical properties of reed-based
MDF were investigated.  Id. at Exhibit 9.


AKCA Response to Scope Request (April 27, 2023), P.R. 7, at 6-7

(summarizing Patent CN104227819A (China): Preparation method for

reed fiber particle board (2014), attached to AKCA Response to

Scope Request as Exhibit 3).  Presented with such information, in

ruling on Kaylang's scope application ITA further observed that

phragmites are indeed a member of a family of grasses consistently

found to be "wood articles" and "of a woody nature", and that

multiple agencies including the ITC and CBP "have classified articles made of ligneous materials as wood articles, and furniture made of bamboo, which is classified as belonging to the same family of grasses as phragmites, classified as wood." Scope Ruling at 9-10. ITA's conclusion therefrom that the scope language covered plaintiff's processed phragmite products was and is not unreasonable.

It is, furthermore, not coincidence that "board" naturally or typically connotes to the mind the association of a product that is of wood or wooden, see, e.g., board, Webster's at 243 ("piece of sawed lumber . . . 5 a : a flat usu. rectangular piece of material (as wood) . . . 6 a : any of various wood pulps or composite materials formed or pressed into somewhat stiff or rigid flat usu. rectangular sheets; specif : material of the same general composition as paper but stiffer and usu. thicker, being in one classification 12/1000 inch thick . . ."), and plaintiff's natural references to its product among its papers consider it a type of board. See, e.g., Pl's 56.2 Br. at 2 ("[t]he cabinets in question were made of composite board made out of Phragmites"; "cabinets made from fiber board made from Phragmites").

Court No. 24-00045                                      Page 16

V

In the light of the foregoing, this court cannot conclude ITA's <u>Scope Ruling</u> unsupported by substantial evidence on the record or otherwise not in accordance with law.  Ergo, plaintiff's motion for judgment on the agency record must be denied, with judgment entered accordingly.


Decided:  New York, New York
          February 21, 2025


                              /s Thomas J. Aquilino, Jr.
                                   Senior Judge